UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RACHEL BOIM, by and through                :
her Conservator, NANCY BOIM,
and NANCY BOIM, as Conservator             :
of RACHEL BOIM, a minor,
                                           :
    Plaintiffs,
                                           :     CIVIL ACTION NO.
v.
                                           :     1:05-CV-2836-MHS

FULTON COUNTY SCHOOL
DISTRICT d/b/a FULTON COUNTY               :
PUBLIC SCHOOLS, et al.,
                                           :
    Defendants.

---

DAVID and KIMBERLY BOIM,                   :

    Plaintiffs,                            :
                                                 CIVIL ACTION NO.
v.                                         :
                                                 1:05-CV-3219-MHS
FULTON COUNTY SCHOOL                       :
DISTRICT d/b/a FULTON COUNTY
PUBLIC SCHOOLS, et al.,                    :

    Defendants.                            :

## ORDER

These two related cases are before the Court on cross-motions for summary judgment. For the following reasons, the Court grants defendants' motions, denies plaintiffs' motions, and dismisses both actions.

Background

In the fall of 2003, Rachel Boim, a ninth-grade student at Roswell High School, was suspended from school for ten days because of a story she had written in a notebook. One of Rachel's teachers discovered the story when he took the notebook from Rachel after seeing her pass it to another student during class. In the story, which is told in the first person, a student dreams of shooting her sixth period math teacher during class. Like the student in the story, Rachel's sixth period class was math. In its entirety, the story reads as follows:

> As I walk to school from my sisters [sic] car my stomach ties itself in nots [sic]. I have nervousness tingeling [sic] up and down my spine and my heart races. No one knows what is going to happen. I have the gun hidden in my pocket. I cross the lawn and hed [sic] to my locker on A hall. Smiling sweetly to my friends hoping they dont [sic] notice the cold sweat that has developed on my forehead [sic]. Im [sic] walking up to the front office when the bell rings for class to start. So afraid that I think I might pass out. I ask if my mother dropped off a book I need. No. My first to [sic] classes pass by my heart thumping so hard Im [sic] afraid every one can hear it. Constantly I can feel the gun in my pocket. 3rd peroid [sic], 4th, 5th then 6th peroid [sic] my time is comming [sic]. I enter the class room my face pale. My stomach has tied itself in so many knots its [sic] doubtful I will ever be able to untie them. Then he starts taking role [sic]. Yes, my math teacher. I lothe [sic] him with every bone in my body. Why? I dont [sic] know. This is it. I stand up and pull the gun from my pocket. BANG the force blows him back and every one in the class sits there in shock. BANG he falls to the floor

2

> and some one [sic] lets out an ear piercing scream. Shaking I put the gun in my pocket and run from the room. By now the school police officer is running after me. Easy I can out run him. Out the doors, almost to the car. I can get away. BANG this time a shot was fired at me. I turn just in time to see the bullet rushing at me, almost like its [sic] in slow motion. Then, the bell rings. I pick my head off my desk, shake my head and gather up my books off to my next class.

After reading the story and conducting an investigation, Roswell High School Principal Edward J. Spurka concluded that Rachel had violated three rules in the Student Code of Conduct: Rule 4iii (threatening a school employee with bodily harm), Rule 10 (failure to comply with school rules, directions, or commands),[1] and Rule 17 (exhibiting disrespectful conduct). As a result, he suspended Rachel for ten days.

At the conclusion of the ten-day suspension, a disciplinary hearing was held. The Hearing Officer ruled that Rachel should be expelled for the balance of the school year but waived the expulsion to allow her to attend another traditional school in Fulton County. Rachel appealed the Hearing Officer's ruling, and the expulsion was stayed pending a decision by the Fulton County Board of Education on the appeal. After reviewing the case,

---

[1] This violation apparently relates to Rachel's initial refusal to give her teacher the notebook containing the story.

3

the Board affirmed the ten-day suspension but decided not to expel Rachel. Therefore, she was allowed to remain at Roswell High School.

Nearly two years later, on October 4, 2005, Nancy Boim[2] filed suit on Rachel's behalf in the Superior Court of Fulton County against the school district, Superintendent James Wilson, and Principal Spurka. Plaintiffs alleged that the ten-day suspension violated Rachel's free speech rights under the First and Fourteenth Amendments to the U.S. Constitution and Art. 1, Sec. 1, Para. 5 of the Georgia Constitution. The complaint sought nominal damages of $1.00 and an injunction requiring defendants to expunge the disciplinary action from Rachel's school records. A few days later, on October 7, 2005, Rachel's parents, David and Kimberly Boim, filed a virtually identical lawsuit in the State Court of Fulton County. Their complaint sought an award of damages for the legal fees and expenses they had incurred in responding to the disciplinary proceedings on Rachel's behalf.

---

[2] The record is silent as to the relationship between Nancy Boim and Rachel Boim, but the complaint alleges that Nancy Boim is the "duly appointed conservator of Rachel Boim" pursuant to an Order of the Fulton County Probate Court. Compl. ¶ 2.

Defendants removed both actions to this Court. Plaintiffs and defendants in both cases now move for summary judgment.[3]

Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." Id. at 325. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. Id. at 324.

In reviewing a motion for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most

---

[3] In the first case, plaintiffs Rachel and Nancy Boim did not file a separate motion for summary judgment but requested summary judgment in their brief in opposition to defendants' motion for summary judgment. In the second case, plaintiffs David and Kimberly Boim seek only partial summary judgment as to defendants' liability.

5

favorable to the non-moving party. <u>WSB-TV v. Lee</u>, 842 F.2d 1266, 1270 (11th Cir. 1988). Nevertheless, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original).

The Rule 56 standard is not affected by the filing of cross motions for summary judgment: "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2720 at 335-36 (3d ed. 1998). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. See <u>United States v. Oakley</u>, 744 F.2d 1553, 1555 (11th Cir. 1984).

Discussion

Defendants contend that the disciplinary action taken against Rachel did not violate her right to free expression under the First Amendment because the story she wrote "materially and substantially disrupted the work and discipline of the school and constituted a threat of violence against a teacher." (Br. in Support of Mot. for Summ. J. at 10.)  Defendants also contend that defendant Spurka is entitled to qualified immunity and that defendant Wilson is entitled to summary judgment because he did not become superintendent of the Fulton County Schools until long after this incident. Defendants argue that defendant Fulton County School District cannot be held liable because there is no evidence that the disciplinary action taken against Rachel was the result of any policy or custom of the school district. Finally, defendants contend that plaintiffs have failed to satisfy the prerequisites for injunctive relief because they cannot establish either a constitutional violation or irreparable injury and because they failed to exhaust their administrative remedies.

Plaintiffs argue that Rachel's story is entitled to First Amendment protection because it did not in any way disrupt the work or discipline of the

7

school, nor did it constitute an actual threat of violence. Plaintiffs note that Rachel never disclosed the story to anyone, and that any disruptive impact the story had was the result of the actions of the teacher who confiscated the notebook and of other school officials who decided to disseminate the story. Plaintiffs also argue that the story was clearly a work of fiction, which no reasonable person would interpret as a serious expression of intent to harm. In addition, plaintiffs argue, in order to lose First Amendment protection, a threat must be intentionally or knowingly communicated to someone.

Plaintiffs contend that defendant Spurka is not entitled to qualified immunity because it would have been clear to a reasonable principal that punishing Rachel for the story she had written but never disclosed to anyone violated her clearly established First Amendment rights. As for defendant Wilson, although he was not employed by the school district at the time of the incident, plaintiffs argue that his refusal to expunge Rachel's disciplinary record constitutes a continuing infringement of her First Amendment rights. Plaintiffs argue that the school district may be held liable because defendants admit that the disciplinary action was taken pursuant to established policy and procedures. Finally, plaintiffs contend they are entitled to injunctive

relief in the form of expungement of Rachel's disciplinary record because they have established both a constitutional violation and irreparable injury, and because exhaustion of other remedies is not a prerequisite to an action under 42 U.S.C. § 1983.

As discussed below, the Court concludes that the content of Rachel's story was sufficiently disturbing to cause school officials to reasonably fear substantial disruption of school activities. Therefore, the disciplinary action taken by defendants was justified under the Supreme Court's decision in Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503 (1969), and did not violate Rachel's First Amendment rights. Given this conclusion, the Court finds it unnecessary to address the parties' other arguments.

In Tinker, the Supreme Court held that school officials may justify the suppression of student speech by showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." 393 U.S. at 514. Tinker does not require school officials to wait until disruption actually occurs. Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 529 (9th Cir. 1992). "In fact, they have

9

a duty to prevent the occurrence of disturbances." Id. (quoting Karp v. Becken, 477 F.2d 171, 175 (9th Cir. 1973)). While predicting disruption is unmistakably difficult, Tinker does not require certainty that disruption will occur, "but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption." Karp, 477 F.2d at 175.

In this case, there are two reasons that school officials could have reasonably believed that Rachel's story might cause "substantial disruption of or material interference with school activities." First, they could have feared that Rachel might actually attempt to carry out the actions described in her story. As one school official put it, "My initial reaction was that it was a possible plan disguised as a dream." (Disciplinary Hearing Tr. at 34.) This reaction was certainly not unreasonable given the specific details in the story, including the fact that the victim of the shooting was the narrator's sixth period math teacher and that Rachel's sixth period class was math. In light of the recent history of school shootings, school officials were justified in perceiving the story as a portent of possible future violence.

10

Second, school officials could have reasonably feared disruption of school activities if Rachel's story was read by other members of the school community. While there is no evidence that Rachel ever directly showed the story to anyone else, it is undisputed that she brought the notebook containing the story to school and that she passed the notebook to another student before it was confiscated by a teacher. Regardless of whether Rachel intended the story to be read, the fact that she brought the notebook to school and passed it to another student was enough to cause school officials to be legitimately concerned that the story had been or might be read by others.

Other courts have found similar writings by students not to be protected by the First Amendment. In <u>D. F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.</u>, 386 F. Supp. 2d 119 (E.D. N.Y. 2005), a sixth-grade student wrote and read to his classmates a story in which named students were murdered and sexually assaulted. The court held as follows:

> The story, with its graphic depictions of the murder of specifically named students and sex between named students, may materially interfere with the work of the school by disturbing the students and teachers. . . . Further, the story constitutes a true threat of violence as it describes a student killing other real-life students. This Court is well aware of the legacy of fear and panic that recent acts of devastating school

11

> violence have wrought in this country. Schools must be able to protect their student bodies against such acts and be able to provide a modicum of security for their parents and students. Consequently, Plaintiff's story is not entitled to First Amendment protection. . . .

Id. at 126.

Plaintiffs argue that D. F. is distinguishable because the student in that case actually read the story to his classmates. The Court does not find this distinction relevant. Although speech must be communicated in order to constitute a "true threat," see Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 625 (8th Cir. 2002), communication is not a prerequisite to suppression on Tinker grounds. As previously noted, Rachel took the notebook containing the story to school and passed it to another student, thus creating the risk, if not the likelihood, that it would be read. This was sufficient to qualify the story as student speech on school premises and to authorize school officials to take disciplinary action under Tinker. Cf. Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 615 (5th Cir. 2004)(holding that drawing did not constitute student speech on school premises when it was completed at home, stored for two years, never intended to be brought to

campus, and student "took no action that would increase the chances that his drawing would find its way to school").

In <u>LaVine v. Blaine Sch. Dist.</u>, 257 F.3d 981 (9th Cir. 2001), the Ninth Circuit held that the school district did not violate a high school student's First Amendment rights when it expelled him on an emergency basis after he showed a teacher a poem he had written that was filled with imagery of violent death and suicide and the shooting of fellow students. Plaintiffs attempt to distinguish <u>LaVine</u> on the grounds that the principal in that case considered a number of other factors in addition to the poem before deciding on an emergency expulsion. However, just like the poem in <u>LaVine</u>, Rachel's story "[a]t its extreme . . . can be interpreted as a portent of future violence, of the shooting of [Rachel's math teacher]." <u>LaVine</u>, 257 F.3d at 990. The Court concludes that Rachel's story alone, when read in light of the recent history of school shootings, was sufficient to lead school officials reasonably to forecast substantial disruption of or material interference with school activities–specifically, that Rachel might attempt to shoot her math teacher.

Plaintiffs note that despite finding no First Amendment violation, the Ninth Circuit in <u>LaVine</u> upheld the district court's injunction prohibiting the placement or maintenance of so-called "negative documentation" in the student's file. <u>Id.</u> at 992. In this case, however, plaintiffs do not merely seek the removal from Rachel's file of specific "negative documentation." Instead, they seek a mandatory injunction requiring defendants "to clear and expunge the disciplinary records of Plaintiff Rachel Boim of all offenses and punishments complained of herein and to remove from their files all references to any discipline complained of herein." (Compl., Prayer for Relief ¶ 3.) Given its conclusion that defendants were justified in their actions, the Court finds no basis for such an order in this case.

The cases cited by plaintiffs do not support a different result. In <u>D. G. and C.G. v. Indep. Sch. Dist. No. 11 of Tulsa County, Okla.</u>, No. 00-C-0614-E, 2000 U.S. Dist. LEXIS 12197 (N.D. Okla. August 21, 2000), the court granted a preliminary injunction prohibiting the school district from suspending an eleventh-grade student for writing a poem entitled "Killing Mrs. [Teacher]," in which the student fantasized about killing one of her teachers. The Court finds this case distinguishable on several grounds.

14

First, the poem at issue in <u>D.G.</u> was not nearly as graphic and disturbing as Rachel's story.[4] In fact, the poem did not actually describe the killing of the student's teacher at all but merely referred to the desire to kill her. Rachel's story, on the other hand, describes in graphic detail actually shooting her teacher in the classroom.

---

[4] The poem read as follows:

Killing Mrs. [Teacher]

I hate this class it is hell
Every day I can't wait for the bell,
I bitch and whine until it is time,
For me to get in the hall.

Back in the day,
I would sit and pray
to see if I may
Run away (from this hell)

Now as the days get longer
My yearning gets stronger
To kill the bitcher.

One day when I get out of jail
Cuz my friends paid my bail.
And people will ask why.
I'll say because the Bitch had to die!

By [Student]

<u>Id.</u> at *3.

15

Second, the school district in <u>D. G.</u> did not contend that the poem was a portent of future violence. Instead, it argued that suspension was justified because the poem was an "act of disrespect" which, if allowed to go unpunished, would "be a substantial disruption to the school system in general because it will undermine the school's authority to discipline students." <u>Id.</u> at *15. In this case, on the other hand, school officials feared that Rachel's story was "a possible plan disguised as a dream," and their disciplinary action was at least in part an attempt to prevent actual violence from occurring on the school campus.

Finally, even under the substantially less threatening circumstances presented in <u>D. G.</u>, the court found that "[a] suspension on a short-term basis until the circumstances could be investigated would have been justified under the law." <u>Id.</u> at *18. That is precisely what happened in this case. Although a hearing officer later recommended expulsion, the school board did not follow that recommendation and Rachel ended up serving only a 10-day suspension and then returning to school. There is no issue in this case as to whether a more severe punishment, such as that recommended by the hearing officer, would have violated Rachel's First Amendment rights.

In another case cited by plaintiffs, Boman v. Bluestem Unified Sch. Dist. No. 205, No. 00-1034-WEB, 2000 WL 297167 and 2000 WL 433083 (D. Kan. Jan. 28 and Feb. 14, 2000), a high school senior created a poster and hung it on a door in a school hallway. The poster contained sentences written in circles spiraling outward from the center and included a series of questions and statements, written in first person, asking about "who killed my dog?" and what do "you" know about it. It also included statements that "I'll kill you if you don't tell me who killed my dog" and "I'll kill you all!" The district court held that imposing a long-term suspension and requiring a psychological examination before reinstatement violated the student's First Amendment rights.

Boman is clearly distinguishable from this case. First, like the poem in D. G., the poster in Boman did not contain the same type of graphic violence as Rachel's story. In fact, the hearing officer in that case found "that the allegedly threatening language in the poster was not readily apparent, and that nothing in the poster directs a threat at any particular individual." Boman, 2000 WL 297167 at *2. Rachel's story, on the other hand, described in graphic detail the shooting of a particular teacher.

17

Second, like the court in D. G., the Boman court found that a short-term suspension pending completion of an investigation was appropriate. Id. at *4. It was only a long-term suspension that the court found violated the student's First Amendment rights. As previously noted, there is no issue in this case of whether a long-term suspension or expulsion would have violated Rachel's First Amendment rights. No such punishment was imposed; instead, Rachel received only a short-term suspension, after which she was allowed to return to school.

Plaintiffs also rely on the Fifth Circuit's decision in Porter. In that case, the court considered a student's drawing depicting an armed attack on a school and violent acts against the school principal. The drawing was done at the student's home, stored in a closet for two years, and then unwittingly taken to school by the student's younger brother, where it was discovered. The court concluded, inter alia, that the drawing did not constitute a "true threat," because the student "did not intentionally or knowingly communicate" it to a third party. Porter, 393 F.3d at 617.

The decision in <u>Porter</u> does not affect the Court's analysis in this case. The Court's conclusion that Rachel's First Amendment rights were not violated is not based on a finding that Rachel's story constituted a "true threat" falling outside of First Amendment protection. Instead, as the foregoing discussion makes clear, Rachel's story was properly subject to disciplinary action under the separate and independent legal standard enunciated in <u>Tinker</u>, i.e., it "reasonably . . . led school authorities to forecast substantial disruption of or material interference with school activities."[5] <u>Tinker</u>, 393 U.S. at 514. It is unnecessary for the Court to consider whether the story was also subject to discipline because it constituted a "true threat."

In conclusion, since defendants' actions were justified under the legal standard enunciated in <u>Tinker</u>, Rachel's First Amendment rights were not violated. Since there was no constitutional violation, defendants are entitled to summary judgment on all of plaintiffs' claims.

---

[5] As noted above, the <u>Porter</u> court also considered the <u>Tinker</u> standard but found it inapplicable in that case because the student had never taken the drawing to school or done anything to increase the chance that his drawing would find its way to school. 393 F.3d at 615. As previously discussed, such was not the case with Rachel's story. <u>See</u> discussion at pages 12-13 <u>supra</u>.

Summary

For the foregoing reasons, in Civil Action No. 1:05-CV-2836-MHS, the Court GRANTS defendants' motion for summary judgment [#12], DENIES plaintiffs' request for summary judgment, GRANTS plaintiffs' motion to exceed page limitations [#23], and DENIES AS MOOT plaintiffs' motion to quash subpoena [#33]. In Civil Action No. 1:05-CV-3219-MHS, the Court GRANTS defendants' motion for summary judgment [#10], GRANTS defendants' motion to allow consideration of evidence filed in companion case [#11], and DENIES plaintiffs' motion for partial summary judgment [#12]. Both actions are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED, this ___ day of August, 2006.

_____
Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

AO 72A
(Rev.8/82)